1

2

3

4

5

6

7                 IN THE UNITED STATES DISTRICT COURT

8                     FOR THE DISTRICT OF OREGON

9

10   JULIAN BERTEAU,                )
                                    )     No.   04-1611-HU
11                  Plaintiff,      )
                                    )
12        v.                        )
                                    )     FINDINGS AND RECOMMENDATION
13   JO ANNE B. BARNHART,           )
     Commissioner, Social           )
14   Security Administration,       )
                                    )
15                  Defendant.      )
     ───────────────────────────────)
16
     Tim Wilborn
17   Wilborn & Associates
     2020-C S.W. Eighth Avenue, PMB #294
18   West Linn, Oregon 97068
          Attorney for plaintiff
19
     Karin J. Immergut
20   United States Attorney
     Neil J. Evans
21   Assistant United States Attorney
     1000 S.W. Third Avenue, Suite 600
22   Portland, Oregon 97204
     Lucille Meis
23   Special Assistant United States Attorney
     701 Fifth Avenue, Suite 2900
24   Seattle, Washington 98104
          Attorneys for defendant
25
     HUBEL, Magistrate Judge:
26
          Julian Berteau brought this action pursuant to Section 205(g)
27

28   FINDINGS AND RECOMMENDATION Page 1

of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his application for Supplemental Security Income (SSI) benefits.

## Procedural Background

Mr. Berteau filed an application for SSI benefits on January 9, 2002. The application was denied initially and upon reconsideration. A hearing was held before Administrative Law Judge (ALJ) William Horton on June 11, 2003. On July 21, 2003, the ALJ issued a decision finding Mr. Berteau not disabled. In September 2004, the Appeals Council declined Mr. Berteau's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.

In his decision, the ALJ noted that Mr. Berteau had filed Title XVI and Title II applications on July 10, 1997, asserting disability on the basis of depression and panic disorder since July 1, 1967. The ALJ found that on December 19, 1997, Mr. Berteau was notified of an initial denial of his application, because his substance abuse impairment was a contributing factor to his alleged disability and a legal bar to payment of benefits, and that Mr. Berteau did not seek review of that initial determination. However, a document in the record indicates that Mr. Berteau's initial application was allowed on December 17, 1997. Tr. 72. It also appears from the record, however, that Mr. Berteau never received benefits pursuant to that determination.

///

FINDINGS AND RECOMMENDATION Page 2

## Factual Background

Born in 1947, Mr. Berteau alleges disability beginning June 1, 1969. He completed high school and two years of college, but did not receive a degree. The ALJ found that Mr. Berteau has no past relevant work, which Mr. Berteau does not dispute. Mr. Berteau alleges disability based on a combination of mental impairments, including attention deficit disorder (ADD), bipolar disorder, and anxiety disorder.

## Medical Evidence

Mr. Berteau has a history of both mental illness and alcohol abuse. On May 28, 1997, he presented at the Community Psychiatric Clinic "extremely depressed, suicidal, homeless," and without income, medication or social contacts. Tr. 160. Between June 1997 and December 30, 1997, Mr. Berteau received treatment from the Community Psychiatric Clinic for extreme depression, anxiety, and social isolation, including intensive case management, medication (Zoloft and Zyprexin), group counseling, and assistance in obtaining long-term housing. Tr. 118-60, 192.

During his treatment at the Community Psychiatric Clinic, Mr. Berteau's caseworkers noted his use of alcohol. See, e.g., tr. 151, 139, 136.

On June 6, 1997, Mr. Berteau was given a psychiatric evaluation by James Hoffenbeck, M.D. Tr. 154. Dr. Hoffenbeck noted that Mr. Berteau reported being depressed for many years, and that he had been "looking forward to this appointment because he has been persistently depressed all day, every day." Id. Mr. Berteau

FINDINGS AND RECOMMENDATION Page 3

reported suicidal ideation, very poor and broken sleep, lack of appetite, decreased concentration and energy, crying spells, and decreased interest in things. Id. He said he often thought of death and ruminated over his losses, and that he heard the voices of various people he knew who were dead. The voices were in conjunction with depressed moods. Id. He often felt that "people are out there somewhere who might be wanting to cause him harm, though he is not sure who this is." Id. Mr. Berteau said he felt "this is significantly beyond the amount of fearfulness that a street person would have on a regular basis." Id. He denied specific delusions, panic attacks, obsessions and compulsions. Id.

Mr. Berteau said he had received some outpatient psychiatric treatment while in college in the early 1970s, including Stelazine, Librium, and an "antidepressant that he can't remember." Tr. 153. He denied ever having had an inpatient psychiatric hospitalization or any psychiatric treatment during the past 25 years. Id. He denied ever making a suicide attempt, but said he had "struggled with suicidality for many years." Id.

Mr. Berteau denied significant problems with alcohol or drugs, saying he drank "occasionally but not large amounts." Id.

Dr. Hoffenbeck noted that Mr. Berteau had "very poor hygiene," but that he made good eye contact and was cooperative with the examination. Id. There was no psychomotor agitation or retardation; his speech was modulated and articulate and he had a good vocabulary; thought process was logical and coherent, but positive for suicidal ideation. Id. He was depressed, with a restricted

FINDINGS AND RECOMMENDATION Page 4

affect, but cognitively he was alert and oriented, and grossly cognitively intact. Id.

Dr. Hoffenbeck's diagnoses were major depression with psychotic features, rule out schizoaffective disorder. He assessed Mr. Berteau's current Global Assessment of Functioning (GAF) at 40, with the highest for the past year being 45.[1] Dr. Hoffenbeck prescribed Zoloft and Zyprexa. Tr. 151.

On June 9, 1997, Mr. Berteau's caseworker, Stacey Jones, noted that she had seen him sleeping in the park. Tr. 151. When she woke him, he told her he had been arrested for assault after threatening people on the street. Id. Ms. Jones noted that "client was distressed and hung over." Id.

On June 11, 1997, Mr. Berteau told Ms. Jones he "felt a big difference already" from the medication, including "less anxiety and paranoia." Tr. 150. Ms. Jones noted that Mr. Berteau had a "hard time getting around," but that he wanted to make sure he was able to pick up his medications. Id. Ms. Jones noted that he was "clean, alert, calm and cooperative." Id.

---

[1] The GAF is used by mental health professionals to assess psychological, social and occupational functioning. A GAF between 31 and 40 indicates major impairment in several areas. A GAF between 41 and 50 indicates serious symptoms or any serious impairment of functioning, including being unable to keep a job. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (1994)(DSM-IV) at 32.

FINDINGS AND RECOMMENDATION Page 5

On July 8, 1997, Mr. Berteau's caseworker noted that he admitted drinking three shots of whiskey a day, but that he minimized its effect. Tr. 136. The caseworker discussed with him the effects of alcohol on the medication, and the role of alcohol in exacerbating his depression and paranoia, and he agreed to try to cut back. Id.; tr. 135. Other chart notes from the summer and fall of 1997 indicate that Mr. Berteau continued to drink on a daily basis, see, e.g., tr. 131, 129, 127, 126, 124, and that he was "extremely anxious," having panic attacks, becoming distraught on the bus, and behaving in a nervous and distracted manner. Tr. 134, 137, 132, 126.

On October 28, 1997, Mr. Berteau reported ongoing auditory hallucinations, a voice "similar to his mother's criticizing him." Tr. 122. His caseworker noted that he was "obviously intoxicated, with slowed speech, disheveled." Id. On December 5, 1997, Mr. Berteau was still trying to decrease his alcohol use to three drinks a day. Tr. 121. On December 30, his caseworker noted that Mr. Berteau said he felt less fearful on his current medications, but that he appeared "anxious and guarded." Tr. 119. He admitted to daily drinking, but was "reluctant to say how much. Says he had 4-5 hard liquor drinks today. Clenched his teeth and stated, 'I am not an alcoholic, but I do abuse [alcohol.]'" Id.

On November 29, 1997, Mr. Berteau was examined by Kathleen Andersen, M.D., a psychiatrist. Tr. 191. She recorded that Mr. Berteau reported depression over many years, with a suicide attempt

FINDINGS AND RECOMMENDATION Page 6

when he was in his early twenties, for which he was hospitalized.[2]
Id.  Throughout his twenties he saw various psychologists and
psychiatrists, and was treated with Stelazine. Id. Eventually, he
dropped out of treatment and did not receive psychiatric help for
many years, attempting to medicate himself with alcohol. Id. Mr.
Berteau reported that he began drinking when he was 26 years old
and that he continued to drink into the present time, though more
moderately than in the past. Id.

Mr. Berteau told Dr. Anderson that his suicidal feelings were
related to a "general feeling of worthlessness, being bad, just
hopelessness." Tr. 192. He reported a period of about four years,
from 1972 to 1976, when he was doing reasonably well, working for
a burglar alarm company. Id. He felt that he did well because he
worked by himself. Id. He subsequently moved from place to place
and had a number of jobs, the longest lasting about a year and a
half. Id.

Mr. Berteau reported that since he began taking medication,
the voices he heard were not as frequent or intrusive, and that he
did not feel as angry as before, although he stated that he
currently had a court case pending for aggressive panhandling. Id.
He admitted getting "verbally nasty with people" when they refused
him money. Id. He also acknowledged other misdemeanor charges,
including public intoxication. Tr. 193. Mr. Berteau was currently
under contract with his case manager not to have more than three

[2] This statement contradicted his denial to Dr. Hoffenbeck
of a suicide attempt or inpatient psychiatric hospitalization.

drinks a day. <u>Id.</u>

He reported continuing suicidal ideation, always thinking about "the most merciful way to kill yourself." <u>Id.</u> He was afraid to cross bridges because of an impulse to throw himself off them. <u>Id.</u> He was also afraid of being hit by a car or being around traffic in general, afraid of heights and water, and afraid of getting diseases. <u>Id.</u> Contradicting his statements to Dr. Hoffenbeck, he said he had had panic attacks for many years, on at least a daily basis, with symptoms including sweating, shakiness, and shortness of breath. <u>Id.</u>

Dr. Andersen noted that Mr. Berteau had missed his first appointment, being ultimately located at a bar by his caseworker. Tr. 194. For the second rescheduled appointment, he presented as a "quite shabbily dressed, very marginally groomed, middle aged male." <u>Id.</u> His hair was uncombed. <u>Id.</u> He appeared to be somewhat tense and anxious, "frequently tapping his foot quite vigorously" and shifting around in his chair. Tr. 195. As the interview progressed, he appeared to become more anxious and "did acknowledge that he was feeling more anxious." <u>Id.</u> Dr. Andersen wrote,

> At one point he interrupted me, apologizing, but saying he wanted to know how to get back to Capitol Hill from my office. He said that this was on his mind to the point where he was not able to concentrate on the topics under discussion ... Throughout the interview, his thoughts were logically organized and he did speak articulately. However, he did endorse auditory hallucinations. ... Mostly, these seemed to have a mood congruent content. Delusional thoughts were also endorsed, along the lines of feeling that people were talking about him and wanted to harm him. ... In addition to seeming anxious and rather agitated, he seemed to be depressed. ... Suicidal ideation was endorsed ... He appeared to be of at least average, perhaps high average, intelligence.

FINDINGS AND RECOMMENDATION Page 8

_Id._ Dr. Andersen's diagnoses were probable bipolar Type II disorder, history of alcohol abuse, panic disorder without agoraphobia, and multiple specific phobias. _Id._ Dr. Andersen concluded:

> Mr. Berteau appears to suffer from a very broad array of affective and anxiety related symptomatology. I think it may be likely that he has a Bipolar II disorder with more extensive periods of depression alternating with periods of hypomania or mixed symptomatology which accounts for his irritability, impulsive behavior, agitation, etc. Clearly, he has irrational thoughts, believing that he can hear people talking about him and that he is being harassed by other people when there is no evidence for this. However, most of the content of this appears to be mood congruent and I do not think he meets criteria for a diagnosis of schizophrenia. He appears to be extremely anxious, with a good deal of anxiety being around people and also other multiple phobias which make it quite difficult for him to function day to day in society. Clearly, he has a very sporadic work history, functioning very well below his intellectual capacity over years due to his psychiatric symptomatology. I do not think that he could function consistently enough and interact appropriately enough with co-workers to maintain employment. Even during this short period in my office, he appeared to become rather overwhelmed and distracted by his experience of anxiety and discomfort. He may benefit from trials of other mood leveling medications ... [and] from anti-anxiety medication. ... If he is able to stay in treatment and his situation stabilizes, perhaps at some point in the future consideration could be given to his tentatively trying to re-enter some type of employment on a very limited basis and see how that goes.

Tr. 195-96.

A discharge summary from Community Psychiatric Clinic, dated March 23, 1998, stated that December 30, 1997, was the date of last contact with Mr. Berteau. Tr. 118. Caseworker Stephen Connolly wrote that Mr. Berteau's progress in treatment was "moderate to good but was greatly inhibited by his daily abuse of alcohol.

Medication greatly aided client's depression and mitigated his anxiety to some degree. His insight into his drinking behavior increased over time as well." Id. Mr. Connolly wrote that Mr. Berteau had relocated to Louisiana. Id.

The medical record resumes on January 2, 2002, when Mr. Berteau was evaluated by psychiatrist M. Sadiqur Rahman, M.D. Tr. 162-63. At that time, Mr. Berteau was working in a kitchen and not taking any medication for his depression. Tr. 162. He reported starting to feel depressed during the previous two months, with poor sleep, lack of interest in pleasurable activities, feeling tired and lacking energy. Id. Mr. Berteau reported that he drank alcohol occasionally, the last occasion being "a couple of beers" at Christmas time. Id. Dr. Rahman diagnosed major depressive disorder, recurrent, moderate, without psychotic features. Tr. 163. He assessed Mr. Berteau's GAF at 55. Id.

On February 20, 2002, at the request of Social Security Administration, Mr. Berteau received a psychological evaluation by Robert H. Ellis, Ph.D. Tr. 164-69. Mr. Berteau was living in Jamestown, New York. Tr. 164. He said he had one friend, but no contact with his family. Id. He reported one serious suicide attempt and one psychiatric hospitalization, and said he had received psychiatric treatment for about 14 months in 1997, when he lived in Seattle. Id. He was currently seeing a psychiatrist, id. and taking Welbutrin. Tr. 165. He denied any current alcohol or drug use problems. Id. Mr. Berteau told Dr. Ellis that the only job in which he had been successful was one where he was "all by

himself and the boss checked in very sporadically." Tr. 166. He indicated "that other people do not like him and his jobs never last if he has to interact with others." Id.

Dr. Ellis observed that Mr. Berteau was slightly unkempt and slightly overweight. Id. His hair was unruly and he was unshaven. Id. He assumed a cooperative attitude, and was "mildly agitated but not defensive." Id. His behaviors were eccentric, and he presented as a "very nervous individual who was alert and vigilant." Id. However, he spoke fluently and in an organized, goal-directed manner, and his thoughts were relevant, coherent, and neither loose in association nor tangential. Tr. 166. Affect was mildly agitated and pressured, but basically reactive and spontaneous. Id.

Mr. Berteau reported problems with tearfulness, fatigue, hopelessness, suicidal feelings, suicidal plans, and poor appetite. Id. He also reported "problems with overwhelming fears." Tr. 167. He worried mostly about cancer, and "catastrophizes about the least little health problem to the point that he is incapacitated." Id. He indicated that he felt "panicky almost all the time, especially when he is out among people." Id.

Dr. Ellis diagnosed generalized anxiety disorder, major depressive disorder, in remission with medication intervention, and attention deficit disorder. Tr. 168. Dr. Ellis commented,

> Mr. Berteau shows a lot of anxiety but there seems to be an underlying disinhibition consistent with an attention deficit disorder. ... It is also clear that he has a long history of major depression, with hospitalizations and suicide attempts, quite likely as a result and secondary to his anxiety disorder. He appears to be responding well to the medication and motivated to continue taking the medication.

FINDINGS AND RECOMMENDATION Page 11

Tr. 168. Dr. Ellis thought Mr. Berteau's prognosis was fair, but that his condition was "probably chronic in duration. The claimant's functioning appears to be remaining unchanged over the recent past." Id.

On March 22, 2002, Madan Mohan, Ph.D., performed a records review on behalf of Social Security Administration. In Dr. Mohan's opinion, Mr. Berteau had an organic mental disorder (attention deficit disorder), an affective disorder (major depressive disorder, in remission), and an anxiety-related disorder (generalized anxiety disorder), none of which was of listing level severity.[3] Tr. 170-175. However, Dr. Mohan did not find that Mr. Berteau had a substance addiction disorder. Tr. 170. In Dr. Mohan's opinion, Mr. Berteau was moderately limited in the ability to:

1.    understand and remember detailed instructions;

2.    carry out detailed instructions;

3.    maintain attention and concentration for extended periods;

4.    sustain an ordinary routine without special supervision;

5.    work in coordination with or proximity to others without being distracted;

6.    complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable

---

[3] Organic Mental Disorders are Listing 12.02. Affective Disorders are Listing 12.04. Anxiety-related Disorders are Listing 12.06.

FINDINGS AND RECOMMENDATION Page 12

1        number and length of rest periods;

2    7.    interact appropriately with the general public;

3    8.    get along with co-workers or peers without distracting
4          them or exhibiting behavioral extremes;

5    9.    maintain socially appropriate behavior and adhere to
6          basic standards of neatness and cleanliness;

7    10.   respond appropriately to changes in the work setting.

8  Tr. 184-185. Dr. Mohan concluded that Mr. Berteau was "able to
9  perform simple work-related mental activities," and to "follow
10 simple verbal directions and maintain focus on simple tasks in a
11 low level, low contact work environment." Tr. 186.

12       On May 21, 2002, Mr. Berteau was evaluated by psychiatrist
13 Jayanta K. Pal, a referral from his therapist Dennis Turner. Tr.
14 202-03. Mr. Berteau reported that Dr. Rahman had started him on
15 Welbutrin, which was continued by his primary care physician, Dr.
16 Bhat. Tr. 202. Dr. Pal noted that Mr. Berteau "remains very pseudo-
17 philosophical during the conversation with an inappropriate laugh
18 at times," and that he was "mildly hyperverbal and a bit
19 circumstantial." Id. Mr. Berteau denied any hyper- religiosity, but
20 seemed "obsessed with holy water and communion," and tried to "make
21 a lot of gestures where he makes the cross while he remains very
22 anxious." Id. He complained about a lot of obsessions and
23 compulsions, checking and cleaning things. Id.

24       He had recently moved to Olean, New York, and did not have
25 friends or family in the area. Id. He reported anhedonia and
26 fleeting suicidal ideation. He also reported ongoing auditory

27

28 FINDINGS AND RECOMMENDATION Page 13

hallucinations at least once a month, voices of his dead grandmother and others, but denied command hallucinations and denied acting on the voices. Id. He denied visual hallucinations, but reported ongoing paranoia. Id.

Mr. Berteau reported occasional alcohol use, but denied other drug abuse or dependence. Id. His last job had been two years previously. Id.

Dr. Pal's diagnoses were rule out bipolar mood disorder, Type II with psychosis, history of major depressive disorder, rule out obsessive/compulsive disorder, rule out generalized anxiety disorder, rule out schizotypal personality disorder, and rule out epileptic personality disorder. Tr. 203. Dr. Pal assessed Mr. Berteau's GAF at 50. Id.

Dr. Pal instructed Mr. Berteau to continue taking Welbutrin for depression and started him on Zyprexa for psychosis and bipolar symptoms. Id.

**Hearing Testimony**

Mr. Berteau testified that he was not currently on medication for depression or anxiety because he had been dropped from the Oregon Health Plan. Tr. 211. He was, however, seeing a counselor at Northwest Christian College once a week. Tr. 212. Asked about his symptoms, Mr. Berteau testified that he had "very bad stress, very bad anger," and "periods of depression." Tr. 213. He stated that he quit his last job because he got very angry about some confusion about when he was scheduled to come into work. Tr. 210. He said he usually left jobs for "some kind of emotional reason." Tr. 211.

FINDINGS AND RECOMMENDATION Page 14

Asked whether he had problems concentrating, Mr. Berteau responded that it "would depend on my moods," but at times he would have problems concentrating. Tr. 213. However, he said he usually recalled what he read, even though he tended "not to read, at this point." Id.

He said he was having occasional problems with auditory hallucinations. Tr. 214. He said he also experienced panic attacks set off by fears of heights, bridges, and traffic. Id. On a typical day, he drinks a lot of coffee, smokes a lot of cigarettes, and panhandles, talking to "a lot of people." Tr. 214-15. He spends most of the day panhandling, approximately five hours a day. Tr. 215, 219. He stands in front of the post office or walks around. Tr. 219.

Mr. Berteau testified that when he was taking medication he was "much happier," "more content." Tr. 220. He said being homeless "doesn't seem to be tremendously stressful on me, contrary to what other people might believe," because he had the ability to "get away from people, if I'm bothered." Tr. 220. Mr. Berteau said he had no physical complaints. Tr. 221.

Mr. Berteau testified that he was not currently drinking, although he did drink, at one time, "to medicate myself." Tr. 215. Mr. Berteau explained, "Then I found out about medication, so I didn't do that for a long time," because he realized drinking was "counter-indicated." Id. He stated that "on an average day, I do not drink," but if "somebody would run into me and say here's a beer, I might have one beer or something like that. It wouldn't be

a great consumption of alcoholic beverages." Tr. 220.

Mr. Berteau said he had worked as a cashier between January and September 1998 in Louisiana. Tr. 216. He said the job was working nights in a convenience store. Id. Eventually, he became afraid of being robbed or killed and wanted to lock the door at night; when the employer refused, he quit. Id. Mr. Berteau explained that the convenience store had a window through which he could wait on customers, and he thought the door should be locked as a precaution against robbery. Id.

The ALJ called a psychologist, John B. Nance, Ph.D., to act as a medical expert. Tr. 222-26. In Dr. Nance's opinion, Mr. Berteau had ADD (Listing 12.02, Organic Mental Disorders), bipolar disorder (Listing 12.04, Affective Disorders), anxiety disorder (Listing 12.06, Anxiety-Related Disorders), and substance abuse disorder (Listing 12.09). Tr. 223. The ALJ relied on Dr. Nance's diagnosis for his finding that Mr. Berteau had substance abuse disorder.

Dr. Nance's opinion was that Mr. Berteau had moderate restrictions in activities of daily living, marked difficulty in maintaining social functioning, marked difficulty in maintaining concentration, persistence, and pace, and one or two episodes of decompensation. Tr. 223-24. However, when substance abuse was factored out, Dr. Nance thought Mr. Berteau had only mild restrictions in activities of daily living, moderate difficulty in maintaining social functioning and in maintaining concentration, persistence and pace, and one or two episodes of decompensation. Tr. 224. When asked to assess Mr. Berteau's mental residual

FINDINGS AND RECOMMENDATION Page 16

functional capacity, without the substance abuse problem, Dr. Nance thought that Mr. Berteau was moderately limited in the ability to:

1.  understand and remember detailed instructions;

2.  carry out detailed instructions;

3.  maintain attention and concentration for extended periods;

4.  get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and

5.  set realistic goals or make plans independently of others.

Tr. 224. He thought Mr. Berteau was *markedly* limited in his ability to interact appropriately with the general public. Tr. 225. In Dr. Nance's opinion, Mr. Berteau's combined impairments, including substance abuse disorder, met or equaled a listed impairment, but in the absence of substance abuse, they did not. Tr. 224.

Dr. Nance agreed with Mr. Berteau's counsel that some people with bipolar disorder self-medicate with alcohol if they do not have medication. Tr. 226.

The ALJ also called a vocational expert (VE) to testify. The ALJ asked the VE to consider a hypothetical individual who was physically capable of heavy work, but precluded from a job that would "entail interaction with the general public." Tr. 227. The VE responded that such an individual could perform the unskilled jobs of janitor (medium, unskilled), marker (light, unskilled), and flagger (light, unskilled).

**ALJ's Decision**

FINDINGS AND RECOMMENDATION Page 17

The ALJ noted that Mr. Berteau had filed prior applications on July 10, 1997, in which he asserted disability since July 1, 1969. Tr. 18. On December 19, 1997, the claim was denied in an initial determination notice because substance abuse was a contributing factor material to disability and a legal bar to the payment of benefits. Id. The ALJ found that Mr. Berteau had requested no review of the initial determination, instead filing the current application five years later. Id.

The ALJ concluded that expiration of the 60-day period to request review made the adverse initial determinations administratively final, and that by not filing another application for five years, Mr. Berteau had, through lapse of time, lost the right to seek reopening and revision of the administratively final initial determinations. Id. However, the ALJ concluded that even if Mr. Berteau could request reopening of the initial determinations, because he had mental impairments and was unrepresented when he filed the July 10, 1997 claims, his substance abuse impairment, "then and now," precluded a "legal basis" for the receipt of benefits. Id. Accordingly, the ALJ found that the July 10, 1997 determinations were final, binding and given preclusive effect for disability benefits, through the expiration date of Mr. Berteau's insured status on March 30, 1996, and for SSI benefits through the date of the initial denial, December 19, 1997. Id. He treated the period before Mr. Berteau's current applications as already adjudicated. Id.

The ALJ found no evidence of work at the substantial gainful

activity level since Mr. Berteau's application of January 9, 2002. At step two, the ALJ found that Mr. Berteau had severe mental impairments of ADD, bipolar disorder, and anxiety-related and substance addiction disorders.

The ALJ considered the evidence of Mr. Berteau's treatment at Community Psychiatric Clinic, between June and December 1997, to provide "a background for the period since January 9, 2002." Tr. 19. On the basis of this evidence, the ALJ found that Mr. Berteau's primary impairment was alcoholism, which "predates any other medically determinable mental impairment." Id. He found that the claimant had been "inconsistent as to a history of other mental impairments." Id. To some sources, the "claimant professed a remote suicide overdose with in-patient care but to others he denied a suicide attempt and in-patient care." Id. The ALJ found no record of a medically determinable diagnosed mental impairment before June 1997, when "an evaluator at Community Psychiatric Clinic first diagnosed the claimant with major depression with psychosis." Id. The ALJ found that because Mr. Berteau had minimized the extent of his alcoholism, the evaluator "erroneously believed that no alcohol or drug problems existed for the claimant." Id. However, by December 1997, the ALJ noted, the mental health evaluator stated that "the claimant's response to treatment was 'greatly inhibited by his daily abuse of alcohol.'" Id. [4] The ALJ noted the GAF of 45

[4] The ALJ seems to have mistakenly assumed that the evaluator who diagnosed Mr. Berteau with depression (Dr. Hoffenbeck) is the same evaluator who found Mr. Berteau's

FINDINGS AND RECOMMENDATION Page 19

at that time, "indicating pathology that seriously impaired functioning." Id. The ALJ found Mr. Berteau's testimony about self-medicating with alcohol not credible, "since his substance abuse impairment precedes a diagnosed medically determinable mental impairment." Id.

The ALJ concluded that the evidence established that Mr. Berteau's alcohol abuse was a material to the determination of disability, and that absent substance abuse he was not disabled.

## Standards

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both evidence that supports and evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

---

response to treatment greatly inhibited by his daily abuse of alcohol (caseworker Stephen Connolly).

FINDINGS AND RECOMMENDATION Page 20

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

Under 42 U.S.C. § 423(d)(2)(C), which became effective in 1996, an individual is not considered disabled if alcoholism or drug addiction would be a contributing factor material to the Commissioner's determination that the individual is disabled. Social Security regulations require the ALJ to conduct a materiality analysis, to determine whether a claimant's drug addiction or alcoholism is a "contributing factor material to the determination of disability." 20 C.F.R. § 404.1535. The provision states that "[t]he key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol." Id.

FINDINGS AND RECOMMENDATION Page 21

If a claimant's current physical or mental limitations would remain once he stopped using alcohol, and the resultant limitations were disabling, then alcoholism is not material to the disability, and the claimant will be deemed disabled. Id.

In materiality determinations pursuant to 42 U.S.c. § 423(d)(2)(C), the claimant bears the burden of proving that his alcoholism is not a contributing factor material to his disability determination. Ball v. Massanari, 254 F.3d 817, 821 (9th Cir. 2001).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If so, the claimant is conclusively presumed disabled. Yuckert, 482 U.S. at 141. If not, the Commissioner goes to step three.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d),

416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**Discussion**

Mr. Berteau contends that the Commissioner's decision was erroneous because 1) the ALJ mistakenly applied *res judicata* to his Title II and Title XVI claims, adjudicating only the period applicable to his 2002 application; 2) the ALJ improperly rejected his testimony; 3) the ALJ improperly rejected the opinions of Dr. Andersen and Dr. Mohan and made inconsistent findings with respect to Dr. Nance's opinions; 4) the ALJ's hypothetical to the VE was deficient; and 5) the ALJ's determination that alcohol use was "material" to Mr. Berteau's impairment and therefore precluded a finding of disability was erroneous.

**A. ALJ's application of *res judicata* to earlier claim**

Mr. Berteau notes that the document at tr. 72 "contradicts the ALJ's assertion that Plaintiff's prior Title XVI and Title II

applications ... were denied on December 19, 1997, by initial determination." Page 72 of the record is a document entitled, "Disability Report - Field Office," and states that the "date of last decision" is 12-17-1997, the level of that decision is "1," and that the result was "Allowance." Mr. Berteau requests that the court remand this case with instructions to the ALJ to obtain the prior file and determine whether Mr. Berteau's claim was actually allowed, and if so, to reinstate Mr. Berteau's entitlement to Title II disability benefits.

The Commissioner responds that if Mr. Berteau's claims had been allowed, he would have received Social Security benefits, and that there is no evidence he did. She asserts that Mr. Berteau's 1997 application was denied, and that his request for remand should be denied.

I find the Commissioner's argument unpersuasive because the failure of Social Security Administration ultimately to pay Mr. Berteau benefits does not explain the word "Allowance" on the agency's own document. Despite the fact that Mr. Berteau never received benefits, the only evidence in the record before the court is that the agency initially *allowed* Mr. Berteau's claim. There is no evidentiary support for the ALJ's finding that Mr. Berteau's 1997 application was *denied* on initial consideration.[5] If the

---

[5] The ALJ states in his decision that

[e]arlier records show that the claimant filed prior Title XVI and Title II applications on July 10, 1997, when he asserted disability due to depressive and panic

Social Security Administration allowed Mr. Berteau's claim upon initial consideration in 1997, then the ALJ's conclusion that *res judicata* applied to bar Mr. Berteau's earlier, unappealed application would necessarily require the agency to *award* benefits, not deny them. I recommend that this claim be remanded for determination of whether Mr. Berteau was found disabled in 1997 and, if so, for reinstatement of benefits. If the Commissioner determines that Mr. Berteau was found *not* disabled in 1997, but the Commissioner is unable to establish that Mr. Berteau was notified of the adverse decision, the Commissioner should reconsider the current application without the application of *res judicata*. If Mr. Berteau was found not disabled in 1997, and the Commissioner can prove that Mr. Berteau received notice of the adverse determination, the Commissioner is entitled to apply *res judicata* to the 1997 determination.

---

disorders since July 1, 1967. On December 19, 1997, an initial determination notice denied the claimant disability under Titles XVI and II because his substance abuse impairment was a contributing factor material to disability and a legal bar to payment of benefits.

However, this statement is not supported by a citation to the record, and the record before the court clearly shows that the initial determination notice dated December 19, 1997, has a mark next to the box labeled "Allowance," not "Denial." Tr. 72.

**B. Rejection of claimant's testimony**

Mr. Berteau asserts that the ALJ's stated reasons did not provide a legitimate basis for rejecting Mr. Berteau's testimony about his symptoms.

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). However, the ALJ's findings must be supported by specific, cogent reasons. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be "clear and convincing." Id. The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. Id. The evidence upon which the ALJ relies must be substantial. Id. at 724. See also Holohan v. Massinari, 246 F.3d 1195, 1208 (9th Cir. 2001)(same). There is no evidence of malingering in this record, so the ALJ's credibility findings must satisfy the clear and convincing standard.

The ALJ made the following credibility findings:

> As to subjective representations by the claimant bearing on allegations of disability, the claimant is not entirely credible. The claimant professed being fearful and nervous around people. Yet, the claimant testified that daily he panhandled five hours and earned about $15.00. He arose at 5 or 6 a.m. and panhandled a "great deal." He testified to standing in front of the post office, talking to many people and walking around. Of record, the claimant admitted to a pending court case due for [sic] his "aggressive panhandling." (Exhibit 9F at 2). Second, the claimant's admitted activities fail to support mental incapacity or isolation. In February 2002, the claimant regularly left home, and had weekly contact with a friend. He was an avid reader and often went to

> the library to read because it was free. He walked outside on most days for an hour or so. He also independently shopped, cooked, cleaned, washed laundry and managed his money. He watched television (Exhibit 5F at 4).

Tr. 22. As Mr. Berteau points out, the ALJ's credibility findings are addressed primarily to the issue of whether Mr. Berteau is "fearful or nervous around people," a moot point in view of the ALJ's conclusion that Mr. Berteau was vocationally limited in the ability to interact appropriately with the general public. I agree.

The ALJ found that Mr. Berteau's "admitted activities" failed to support "mental incapacity or isolation," but Mr. Berteau did not testify that he experienced either mental incapacity or isolation.

The ALJ provided no reasons for rejecting Mr. Berteau's testimony that he had problems with anger and depression, suffered from auditory hallucinations and panic attacks, and was afraid of heights, bridges, and traffic. In fact, the ALJ took notice of Mr. Berteau's pending court case for aggressive panhandling, indicating that he believed Mr. Berteau's testimony about problems with anger.

The ALJ rejected Mr. Berteau's testimony about having, in the past, self-medicated with alcohol "since his substance abuse impairment precedes a diagnosed medically determinable mental impairment." However, for reasons discussed below, there is no evidentiary support in the record for the ALJ's finding that Mr. Berteau's substance abuse preceded a diagnosed medically determinable medical impairment. Further, the impairment must necessarily precede the diagnosis. There is, therefore, nothing

inconsistent with self medication prior to diagnosis even if there was evidentiary support for that proposition. Consequently, this finding does not constitute a clear and convincing reason for rejecting Mr. Berteau's testimony.

The ALJ did not explain how Mr. Berteau's ability to read in the library, meet a friend once a week, walk outside, watch television, cook, clean, wash laundry and manage money[6] was necessarily inconsistent with any of the symptoms endorsed by Mr. Berteau in his testimony. I conclude that the ALJ's credibility findings do not satisfy the clear and convincing standard, and that Mr. Berteau's testimony about his symptoms should be credited.

**C.    Opinions of Dr. Andersen and Dr. Mohan**

---

[6] Walking, visiting book stores, living at a transient hotel and doing some cooking, laundry and housekeeping, and reading were activities Mr. Berteau reported to Dr. Andersen in 1997. Tr. 194. However, Mr. Berteau told Dr. Andersen he was "very bad at keeping up on" cooking, laundry and housekeeping as he "simply does not care." Id. In February 2002, Mr. Berteau told Dr. Ellis that his typical daily routine included "reading anything and everything, pacing some in his house and taking a walk outside on most days," as well as watching television and going to the library. Tr. 167. He reported "weekly contact with friends," but also said he had one friend. Tr. 164. Mr. Berteau told Dr. Ellis he was able to do shopping, cooking and cleaning, but said he was "not clean" and did laundry "only occasionally." Tr. 167.

FINDINGS AND RECOMMENDATION Page 28

Mr. Berteau contends that the ALJ erred in rejecting Dr. Andersen's opinion that Mr. Berteau could not function consistently enough, and interact appropriately enough with co-workers, to maintain employment. He argues that Dr. Andersen's opinion should be credited as a matter of law, and he should be found disabled on the basis of that opinion.

Title II's implementing regulations distinguish among the opinions of three types of physicians: 1) those who treat the claimant; 2) those who examine, but do not treat; and 3) those who neither examine, nor treat. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester, 81 F.3d at 830; 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion carries more weight than an examining physician's and an examining physician's opinion carries more weight than a reviewing physician's. Holohan at 1202; Lester at 830; 20 C.F.R. § 404.1527(d). In addition, the regulations give more weight to opinions that are explained than to those that are not, Holohan at 1202, see also 20 C.F.R. § 404.1527(d), and to the opinions of specialists concerning matters relating to their specialty over those of nonspecialists, see id. and § 404.1527(d)(5).

The Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician. If the examining doctor's opinion is contradicted by another doctor, the ALJ must provide specific and legitimate reasons supported by substantial evidence in the record. Lester, 81 F.3d at 830-31.

The first articulation of the "crediting as true" rule was

FINDINGS AND RECOMMENDATION Page 29

made in <u>Varney v. Secretary</u>, 859 F.2d 1396, 1401 (9th Cir. 1988) and related to accepting a claimant's pain testimony as true when it was inadequately rejected by the ALJ. The rule was extended in <u>Hammock v. Bowen</u>, 867 F.2d 1209, 1214 (9th Cir. 1989) to encompass crediting medical opinions as true. In general, when the evidence is strongly in the claimant's favor and the equities are against further delay, the court should apply this prudential rule. See <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996).

In his decision, the ALJ made no reference to the findings of Dr. Andersen, although she was the only medical source who gave an opinion as to Mr. Berteau's ability to maintain employment.[7] His failure to consider this evidence was error. I recommend that her opinion be credited.

Mr. Berteau also asserts that the ALJ erred in failing to consider the opinions of Dr. Mohan, arguing that under Social Security Ruling 96-5p, opinion evidence from psychological consultants to the agency must be evaluated by the ALJ. In his

---

[7] As noted, Dr. Mohan thought Mr. Berteau was able to perform "simple work-related activities," follow simple verbal directions, and "maintain focus on simple tasks in a low level, low contact work environment." This opinion could be construed as contradicting that of Dr. Andersen-- although as a reviewing physician, Dr. Mohan's opinions would be entitled to less weight than those of examining physician Dr. Andersen-- but the ALJ made no reference to the opinions of either Dr. Andersen or Dr. Mohan.

decision, the ALJ made no reference to Dr. Mohan's findings or opinions, particularly the fact that Dr. Mohan did not make a diagnosis of substance addiction disorder. Tr. 170, 178. The ALJ's failure to consider Dr. Mohan's opinions is discussed below.

### D. Hypothetical question to the VE

Mr. Berteau asserts that the ALJ made inconsistent findings with respect to Dr. Nance's opinions, because he adopted Dr. Nance's conclusions in the narrative portion of the decision, but failed to include Dr. Nance's opinions when making the residual functional capacity (RFC) assessment expressed in the hypothetical to the VE.

The ALJ must propose a hypothetical to the VE that is based on medical assumptions supported by substantial evidence in the record that reflects each of the claimant's limitations. Osenbrock v. Apfel, 240 F.3d 1157, 1163 (9th Cir. 2001). If the VE's opinion is not based on all of the claimant's limitations, that testimony has no evidentiary value to support finding that claimant can perform jobs in national economy. Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993); Embrey v. Bowen, 849 F.2d 418 (9th Cir. 1988).

Dr. Nance, whose opinions were adopted by the ALJ, opined that Mr. Berteau was markedly limited in his ability to interact appropriately with the general public, and moderately limited in five areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to get along with co-workers or peers without

distracting them or exhibiting behavioral extremes; and the ability to set realistic goals or make plans independently of others. Mr. Berteau argues that the ALJ included in his hypothetical question to the VE only one of Dr. Nance's findings: that he was markedly limited in his ability to interact appropriately with the general public.

The Commissioner responds that the ALJ's hypothetical included the residual functional capacity to do unskilled work that involved no public interaction, and that this was equivalent to all the limitations assessed by Dr. Nance. However, as Mr. Berteau points out, "unskilled work" corresponds to work skills or work experience, not mental impairments.[8]

_____

[8] Mr. Berteau cites Social Security Ruling 83-10, which provides:

> Ability to perform skilled or semiskilled work depends
> on the presence of acquired skills which may be
> transferred to such work from past job experience above
> the unskilled level or the presence of recently
> completed education which allows for direct entry into
> skilled or semiskilled work. ...

> Unskilled work may be performed by individuals with no
> work skills or no work experience. However ... [a]
> final requirement in determining an occupational base
> under the rules within a table is that the RFC reflects
> no impairment-caused limitation affecting performance

Mr. Berteau argues that the ALJ's finding that he had "severe" mental impairments necessarily meant that his impairments "significantly limit [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs," id., including some activities in which Dr. Nance thought Mr. Berteau moderately limited, such as responding appropriately to supervision, co-workers and usual work situations. See 20 C.F.R. § 416.921(b).

Mr. Berteau argues that because the ALJ found him to have severe mental impairments, he necessarily also found that he was significantly limited in his ability to perform basic work activities. Thus, the ALJ's RFC limitation to "unskilled work" fails to take into account Mr. Berteau's severe mental impairments because "unskilled work," by definition, presumes an ability to perform basic work activities, while severe mental impairments, by definition, presume significant limitations on the ability to perform basic work activities.

I agree with Mr. Berteau that the ALJ's RFC assessment, and

of other than exertional activities, i.e., no nonexertional limitation. Thus, the only impairment-caused limitations considered in each rule are exertional limitations. Accordingly, the RFC considered under each rule reflects the presence of nonexertional capabilities sufficient to perform unskilled work. ...

FINDINGS AND RECOMMENDATION Page 33

his hypothetical question to the VE, fail to take into account all of the limitations found by the ALJ and based on Dr. Nance's opinions. Thus, the VE's opinion does not constitute sufficient evidence to support the Commissioner's finding that, despite his impairments, Mr. Berteau retained the residual functional capacity to do work that existed in the national economy.

**E. ALJ's determination that alcohol use was "material"**

The ALJ stated in his decision that the records of Mr. Berteau's care at Community Psychiatric Clinic provided a "background for the period since January 9, 2002," and found further that "these records reinforce that the claimant's primary impairment is alcoholism, which predates any other medically determinable mental impairment." Tr. 19.

This finding is clearly erroneous in three respects. First, there is no evidence that Mr. Berteau is impaired by alcoholism. To be considered an impairment, a condition must be medically determinable. 42 U.S.C. § 423(d)(3). The record of Mr. Berteau's treatment in 1997 at the Community Psychiatric Clinic demonstrates daily use of alcohol and that it greatly inhibited his treatment. He did gain insight into his drinking behavior. While suggestive of alcoholism, that specific diagnosis does not appear in that record. There is no evidence of excessive alcohol use, interference with treatment from alcohol use, or diagnosis of alcoholism in the record thereafter.

Second, even if Mr. Berteau could be considered impaired by alcoholism on the basis of the 1997 chart notes, there is no

FINDINGS AND RECOMMENDATION Page 34

evidence that alcoholism is, or ever was, his "primary impairment." And third, there is no evidence that Mr. Berteau's use of alcohol predates any other medically determinable mental impairment. The record does not support the finding that at the time of the hearing, alcoholism played any role in his disability.

### 1.   No medical evidence of alcoholism as an impairment

The records of the Community Psychiatric Clinic, which are chart notes from non-medical sources, do not contain a medical diagnosis of alcoholism. Dr. Hoffenbeck, who was Mr. Berteau's prescribing physician at Community Psychiatric Clinic, see tr. 149, and an examining physician, did not diagnose alcoholism or substance abuse disorder at his evaluation on June 6, 1997.

Dr. Andersen, who evaluated Mr. Berteau on November 29, 1997, did not diagnose alcoholism or substance abuse disorder, even though she was aware of Mr. Berteau's drinking behaviors. Dr. Andersen wrote that Mr. Berteau reported trying to medicate himself with alcohol, that he first began drinking when he was 26 years old, and that he "continues to drink into the present time." Tr. 191. Dr. Andersen also wrote that Mr. Berteau told her he was "currently under contract with his case manager not to have more than three drinks a day," and that over a ten year period, "he used to drink more heavily, drinking on average of a six pack a day or more." Tr. 193. Despite these statements, Dr. Andersen did not diagnose alcoholism or substance addiction disorder, although she noted "history of alcohol abuse." Tr. 195.

Nor is there a diagnosis of alcoholism or substance abuse

disorder from examining psychologist Ellis, who stated that he had reviewed clinical records, tr. 164; examining psychiatrist Pal, who noted, "[c]hart is reviewed and contents noted," tr. 202; or reviewing psychologist Mohan, who performed his record review in March 22, 2002, and presumably reviewed the 1997 Community Psychiatric Clinic chart notes and all the previous evaluations.

### 2. No evidence after 1997 contradicting Mr. Berteau's denial of alcohol abuse

While it could be argued that the absence of an alcoholism diagnosis is the result of Mr. Berteau's minimizing statements to evaluators, *see, e.g.,* tr. 153 (telling Dr. Hoffenbeck he did not have significant problems with alcohol); tr. 162 (report to Dr. Rahman that he "drinks alcohol occasionally"); tr. 165 (denial to Dr. Ellis of any current alcohol problems); tr. 202 (reporting occasional alcohol use to Dr. Pal), there is nothing in the record after 1997 which contradicts these statements. Similarly uncontradicted is Mr. Berteau's testimony that he currently did not "drink very much," that "on an average day," he did not drink except for "one beer" if someone ran into him, and that he drank "a couple of beers" at Christmas. Tr. 162, 215, 221. The ALJ provided no reasons for disbelieving this testimony, and it must therefore be credited as true.

### 3. No evidence that alcoholism, even if it exists, is Mr. Berteau's "primary impairment"

The ALJ cites no evidence of Mr. Berteau's alcoholism except for the 1997 Community Psychiatric Clinic chart notes, and for the reasons stated, this evidence is insufficient to support his

finding that Mr. Berteau was an alcoholic. I am unable to locate any evidence at all in the record which supports the ALJ's finding that alcoholism is Mr. Berteau's "primary impairment." The finding is undermined by Dr. Andersen's failure to make any diagnosis regarding Mr. Berteau's use of alcohol.

      **4.    No evidence that alcoholism, even if it exists, predates Mr. Berteau's other medically documented mental impairments**

I also find no substantial evidence in the record which supports the ALJ's finding that Mr. Berteau's alcohol abuse predated his medically determinable mental impairments. The only evidence on the issue of when Mr. Berteau began abusing alcohol is Mr. Berteau's statement to Dr. Andersen that he began drinking at about the age of 26, tr. 191. However, this statement does not necessarily establish that Mr. Berteau was an alcoholic at the age of 26. Moreover, Mr. Berteau also told Dr. Andersen that he made a suicide attempt in his "early twenties." Id. The two statements taken together do not suggest that the use of alcohol predated the suicide attempt. Mr. Berteau's statement to Dr. Hoffenbeck that he had received outpatient psychiatric treatment "while in college in the early 1970s," including Stelazine, Librium, and an antidepressant, also suggest that Mr. Berteau's depression, bipolar disorder, and anxiety disorder predate his use of alcohol.

The ALJ found no record of a medically determinable diagnosed mental impairment before June 1997, when "an evaluator at Community Psychiatric Clinic first diagnosed the claimant with major

depression with psychosis."[9] But this does not establish that alcoholism predated Mr. Berteau's depression or other mental impairments because there is no medical documentation of alcoholism as an impairment either before or after June 1997.

I conclude that the record as a whole does not provide substantial evidence to support the ALJ's findings that Mr. Berteau is impaired by alcoholism or by substance abuse disorder, that alcoholism is Mr. Berteau's primary impairment, or that alcoholism predated his other impairments of depression, bipolar disorder, anxiety disorder, and ADD.

### 5. The materiality analysis

Mr. Berteau also challenges the ALJ's finding that when alcohol abuse is factored into his other impairments, he is disabled, but when it is factored out, he is not disabled. The ALJ's relied on the opinions of Dr. Nance to support this finding.

Dr. Nance testified that with substance abuse, Mr. Berteau's combined mental impairments met or equaled Listings 12.02 (ADD), 12.04 (Bipolar Disorder), 12.06 (Anxiety Disorder), and 12.09 (Substance Abuse Disorder), but without it, his impairments would not meet or equal a listed impairment. Tr. 223-24. On the basis of that opinion, the ALJ concluded that, absent substance abuse, Mr. Berteau was not disabled.

The ALJ did not ask Dr. Nance to explain his opinions, and he

---

[9] The evaluator was Dr. Hoffenbeck, tr. 155, who significantly did *not* diagnose alcoholism or substance abuse disorder.

FINDINGS AND RECOMMENDATION Page 38

did not do so. [10] The failure to explain his opinions detracts from their weight. <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1201-02 (9th Cir. 2001); 20 C.F.R. § 404.1527(d)(regulations give more weight to opinions that are explained than to those that are not). It is not apparent to the court how Dr. Nance determined the severity of Mr. Berteau's combined impairments, or the variations in his ability to function, in the presence or absence of alcoholism.[11]

Mr. Berteau argues that although the claimant has the burden of showing that substance abuse is not a material factor, the agency has promulgated instructions which provide that a finding of "not material" must be made in cases where limitations resulting

---

[10] Dr. Nance testified that the record was "replete with instances of minimization of denial" [sic], tr. 224, but he did not identify these instances. While unquestionably the evidence from 1997 supports a conclusion that Mr. Berteau minimized his alcohol use, there is no such evidence after that date. Nor does Dr. Nance explain the *non sequitur* in his testimony that Mr. Berteau's minimization of his alcohol use was what enabled Dr. Nance to assess Mr. Berteau's functioning if alcoholism were factored out. <u>Id.</u>

[11] The absence of explanation from Dr. Nance is particularly problematic because Dr. Mohan, also a reviewing psychologist, assessed Mr. Berteau's RFC *in the absence of a diagnosis of alcohol abuse* and arrived at very different conclusions about his residual functional capacity. See tr. 184-85.

FINDINGS AND RECOMMENDATION Page 39

from substance abuse cannot be disentangled from those resulting from other mental impairments. Mr. Berteau cites to an Emergency Teletype promulgated by the Social Security Administration on August 30, 1996 (available at www.ssas.com/daa-q&a.htm, and also relied on by the Commissioner).[12] He argues that there is no

---

[12] Question 29 and its answer, from the Emergency Teletype is as follows:

> Q: The most complicated and difficult determinations
>
> of materiality will involve individuals with
>
> documented substance use disorders and one or more
>
> other mental impairments. In many of these
>
> instances, it will be very difficult to
>
> disentangle the restrictions and limitations
>
> imposed by the substance use disorder from those
>
> resulting form other mental impairment(s). Can any
>
> examples be provided for how to handle the
>
> materiality determination in these situations, or
>
> can any guidance be provided for the type of
>
> information that should be used in trying to
>
> assess the impact of each impairment?
>
> A: We know of no research data upon which to reliably
>
> predict the expected improvement in a coexisting
>
> mental impairment(s) should drug/alcohol use stop.
>
> The most useful evidence that might be obtained in

FINDINGS AND RECOMMENDATION Page 40

affirmative evidence that his impairments would cease to be
disabling in the absence of substance abuse.

The ALJ's materiality determination is flawed in several
respects. One is that there is no evidence that Mr. Berteau has the
medically determinable impairment of alcoholism. Another is that
the ALJ gave no reason for disbelieving Mr. Berteau's testimony
that he does not currently abuse alcohol. A third is that Dr. Nance
provided no explanation for his conclusion that Mr. Berteau had a
diagnosis of substance abuse disorder. Dr. Nance's conclusion is
against the great weight of the evidence from treating and
examining psychologists and psychiatrists, is from a reviewing

> such cases is that relating to a period when the
> individual was not using drugs/alcohol. Of course,
> when evaluating this type of evidence
> consideration must be given to the length of the
> period of abstinence, how recently it occurred,
> and whether there may have been any increase in
> the limitations and restrictions imposed by the
> other mental impairments since the last period of
> abstinence. <u>When it is not possible to separate</u>
> <u>the mental restrictions and limitations imposed by</u>
> <u>DAA [i.e., drug and alcohol abuse] and the various</u>
> <u>other mental disorders shown by the evidence, a</u>
> <u>finding of "not material" would be appropriate.</u>
> (Emphasis added).

psychologist, and is unexplained. All these factors detract from its weight, and additionally, the ALJ failed to explain why he accepted Dr. Nance's opinion over those of Doctors Andersen and Mohan.

A fourth is that Dr. Nance did not explain how he differentiated the severity of Mr. Berteau's impairments and his functional capacity in relation to a substance abuse disorder. The absence of such an explanation provides no basis for separating the limitations imposed by Mr. Berteau's other impairments from those Dr. Nance considers attributable to alcoholism, and indicates a finding of "not material" under the agency's own policies.

In view of the absence of any evidence after 1997 that Mr. Berteau was abusing alcohol or minimizing his use of alcohol, and the failure of Dr. Nance to explain his opinion that, absent alcoholism, Mr. Berteau's ADD, depression, and anxiety disorder were not disabling, I conclude that the ALJ's finding that alcoholism was material to Mr. Berteau's disability is unsupported by substantial evidence in the record.

**F.   Remand for further proceedings or award of benefits**

Mr. Berteau urges the court to reverse the ALJ's decision, and remand for immediate payment of benefits. He also requests that the court enter an order remanding for a determination of whether he was found disabled in 1997 and, if so, an award of retroactive benefits. If the Commissioner determines that Mr. Berteau's 1997 application was denied, Mr. Berteau asks the court to instruct the ALJ to rehear his current claim for the period prior to 2002

without applying res judicata.

     The decision whether to remand for further proceedings turns upon the likely utility of such proceedings. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1179 (9th Cir. 2000). A remand for further proceedings on the issue of disability is unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to award benefits. <u>Holohan</u>, 246 F.3d at 1210.

    In <u>Smolen v. Chater</u>, 80 F.3d 1273, 1292 (9th Cir. 1996), the court held that improperly rejected evidence should be credited and an immediate award of benefits be made when: 1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, 2) there are no outstanding issues that must be resolved before a determination of disability can be made, and 3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. If the <u>Smolen</u> test is satisfied, then remand for payment of benefits is warranted.

    The ALJ's finding that Mr. Berteau is impaired by alcoholism is unsupported by substantial evidence in the record. The ALJ failed to provide legally sufficient reasons for rejecting Dr. Andersen's conclusion that Mr. Berteau's mental impairments made him unable to function consistently enough and interact appropriately enough with coworkers to maintain employment. While Dr. Andersen's opinion must therefore be credited as true, Dr. Andersen's opinion did not address the question of whether alcohol abuse played any role in Mr. Berteau's disability. I conclude, therefore, that remand for further proceedings is required.

FINDINGS AND RECOMMENDATION Page 43

The record as it now stands is contradictory on the issue of whether Mr. Berteau's initial application for disability benefits was allowed. The Commissioner should determine the status of that application and, if the application was allowed, award benefits retroactive to the date of that application. However, if the claim was denied, *and if the Commissioner establishes that Mr. Berteau was informed of the denial,* then Mr. Berteau's failure to appeal the adverse determination within 60 days makes the application of *res judicata* appropriate. I therefore recommend that, under such circumstances, the Commissioner not be precluded from applying *res judicata* to the 1997 application.

## Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due January 23, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due February 6, 2006, and the review of the Findings and Recommendation will go under advisement on that date.


Dated this 6th day of <u>January</u>, 2006.


/s/  Dennis James Hubel

Dennis James Hubel
United States Magistrate Judge

FINDINGS AND RECOMMENDATION Page 44